# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### March 29, 2012 Session

## IN RE CERA B., KELLIE B., AND DONALD B.[1]

**Appeal from the Chancery Court for Lawrence County**
**No. 1523211      Stella L. Hargrove, Chancellor**

---

### No. M2011-01912-COA-R3-PT - Filed May 24, 2012

---

In this appeal, the Mother and Father of three children appeal the termination of their parental rights on the ground of abandonment by failure to visit and failure to support. We reverse the termination of parental rights on the ground of abandonment by failure to support; in all other respects, we affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part and Affirmed in Part**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Stacie Odeneal, Lawrenceburg, Tennessee, for the Appellant, Rebecca B.

Teresa P. Martin, Lawrenceburg, Tennessee, for the Appellant, Donald B.

Robert E. Cooper, Jr., Attorney General and Reporter, Joshua Davis Baker, Assistant Attorney General, Nashville, Tennessee, for the Appellee, Tennessee Department of Children's Services.

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties. The Father and one child share the same name; references in this opinion to Donald B. are to the child who is the subject of the proceeding.

**OPINION**

## I. Factual and Procedural History[2]

The three children of Rebecca B. ("Mother") and Donald B. ("Father") were placed in the protective custody of the Department of Children's Services (the "Department") on October 8, 2008, as a result of a dependency and neglect proceeding filed by the Department; they were subsequently placed in foster care. The children had previously been in the custody of the Iowa Department of Human Services from March 2007 to September 2008 as a result of allegations of abuse at the hands of Father and environmental conditions at their home; supervision in Iowa ended on September 9, 2008. Father secured employment at a fair in Lawrenceburg, Tennessee, on September 24 and moved from Iowa; shortly thereafter Mother and the children who are the subject of this proceeding joined him. In October 2008, Mother, Father and the children were discovered living in Lawrence County in squalid conditions; the Department initiated the dependent and neglect proceeding.

Father, who had a prior conviction in Iowa for lewd behavior with a minor but had not registered in Tennessee as a sex offender, was arrested for violation of the sexual offender registry law; Father was also wanted in Iowa on four counts of child abuse. On March 26, 2009, Father pled guilty to two counts of violation of the sex offender registry law, Tenn. Code Ann. § 40-39-208, and was placed on probation for one year. A revocation arrest warrant was issued for him on May 15, 2009 for violation of his probation; the affidavit in support of the application for the arrest warrant noted that Father's whereabouts were unknown.[3] Mother moved to Missouri in January 2009. Neither parent has visited the children since January 2009.

The Department initiated this proceeding on February 9, 2011, alleging five grounds to support the termination of Mother and Father's parental rights. With respect to both parents, the petition alleged abandonment by failure to visit, Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i), (1)(C) and (1)(E); abandonment by failure to provide a suitable home, Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii); substantial noncompliance with the permanency plans prepared after the children came into the Department's custody, Tenn. Code Ann. §§ 36-1-113(g)(1) and 37-2-403(a)(2); and persistence of conditions, Tenn. Code Ann. §§ 36-1-113(g)(3). The petition additionally alleged abandonment by failure to support, Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-

---

[2] Much of the factual history is derived from the record of the dependency and neglect proceeding, which was introduced into the record of the termination proceeding.

[3] Father was subsequently located in Iowa.

102(1)(A)(i), (1)(C) and (1)(E), on the part of Father.[4] Following a trial at which neither parent appeared,[5] the court terminated both parents' parental rights on the ground of abandonment by failure to visit and failure to support. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i). The issue on appeal is whether the termination of parental rights is supported by clear and convincing evidence.[6]

## II. Standard of Review

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174–75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982); *Hawk v. Hawk*, 855 S.W.2d 573, 579 (1993)). Our termination statues identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, *IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. April 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). To support the termination of parental rights, petitioners must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); Tenn. Code Ann. § 36-1-113(c).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769; *Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt

---

[4] At the onset of trial, the Department announced it was proceeding on the sole ground of abandonment.

[5] Mother and Father were represented at the hearing by counsel.

[6] The Department concedes that there is insufficient proof in the record to sustain the termination of parental rights on the ground that the parents failed to make reasonable payments toward the support of the children; we reverse the trial court's decision in that regard. In a termination of parental rights proceeding where more than one ground has been alleged, only one ground need be proved, so long as that ground is proved by clear and convincing evidence. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). Consequently, we will address the ground of abandonment by failure to visit.

about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*

In light of the heightened standard of proof in these cases, the reviewing court must adapt the customary standard of review set forth at Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d at 654. As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

## III. Analysis

### A. Grounds for Termination

Tenn. Code Ann. § 36-1-113(g)(1) permits a court to terminate parental rights when the court determines that the child has been abandoned, as defined in Tenn. Code Ann. § 36-1-102(1)(A)(i).[7] In determining whether abandonment has been proven, the court must also find that the parent's conduct was wilful. *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The order terminating parental rights stated:

> The Court finds that DCS has carried its burden of proof by clear and convincing evidence that each Respondent has willfully abandoned the children within the meaning of Tenn. Code Ann. § 36-1-102(1)(A)(i) and that the parental rights of each Respondent should be terminated.

---

[7] Tenn. Code Ann. § 36-1-102(1)(A)(i) provides:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; . . .

The Court finds that willfulness has been proven pursuant to *In re Audrey S., 182 SW.3d 838, at 864* (Tenn. Ct. App.2005), in that each parent is (1) aware of the duty, (2) is capable of discharging it, (3) makes no effort to do so, and (4) has no justifiable excuse for the failure.

Neither party disputes the fact that they did not visit the children within the four months preceding the February 9, 2011 filing date of the petition. Both parents contend that the evidence preponderates against the necessary finding of wilfulness. Father contends that the Department did not show by clear and convincing evidence that he was aware of his duty to visit the children, that he had the capacity to do so but made no attempt to visit, and that he had no justifiable excuse; that the evidence shows that his efforts to "stay in contact" with his children after he moved from Tennessee were thwarted by the Department; and that there was no evidence of his income, whether he had the ability to pay support, or whether he in fact supported the children from the period of their initial placement into the Department's custody until the date of trial. Mother contends that the evidence does not show that she failed to visit her children "consistent with the factors set forth in *In re Audrey S.*"; that the finding of the Juvenile Court in the dependent and neglect proceeding that she was unable to pay support shows that her failure to support was not wilful; and that the Department "effectively thwarted" her efforts to maintain a relationship with the children.

In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), the court discussed wilfulness in the context of termination cases:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36–1–102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months. . . . In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing. . . . Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty . . . or amounts to a significant restraint of or interference with

-5-

the parent's efforts to support or develop a relationship with the child. The parental duty of visitation is separate and distinct from the parental duty of support. Thus, attempts by others to frustrate or impede a parent's visitation do not provide justification for the parent's failure to support the child financially.

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* at 863–64 (citations and footnotes omitted).

The evidence at trial included the testimony of Melanie Harwell, a Family Service Worker with the Department who had responsibility for the three children at issue, the records of the dependent and neglect proceeding, and the Department's cumulative record of what transpired in its handling of each child's case.[8] With respect to the parents' visitation with the children and, specifically, the Department's efforts to assist in the visitation, Ms. Harwell testified:

Q. So when is the last time the mother visited?
A. The last time the mother visited was in January 2009.
Q. And when was the last time that the father visited?
A. Early 2009. I'm not sure of the exact time.
Q. Did the Department encourage them not to visit the children?
A. No, opposite. The Department offered them gas cards once they even left the state. Offered them hotels, to put them up in a hotel so that they could come down. And the father gave his reason there, why he couldn't come, and the mother did not come.
Q. So you're saying that - - I know you read about the gas cards and the mother and father refusing. Are you saying the Department offered gas cards also to the mother?
A. Yes. Yes.
Q. Do you know where she's living?
A. She's living, the last I heard, in Gallatin, Missouri.
* * *

---

[8] The cumulative record, known as TFACTS, was admitted into evidence as a business record; it contained an entry summarizing each contact the caseworker had relative to the particular case.

They have not offered to come. They did not come when they were given - - when they were offered assistance to come visit.

* * *

Q. Has either parent maintained - - and I'm reading from 36-1-113, 5-3. Has either parent maintained regular visitation with the children?

A. No.

Q. And, in fact, you talked about it the last time.

A. Right. Right.

Q. Do you feel like this lack of visitation was willful on the parents' part?

A. Apparently the father wasn't going to visit here. He wasn't coming back to the state of Tennessee, from what he stated to the FSW. The mother was offered her chances, and for whatever reason did not take the help to come back.

Ms. Brigitte Massey, supervisor for social services in Lawrence County, also testified relative to the Department's efforts:

Q. And to your knowledge, the petition was filed, of course, in February of '11. To your knowledge prior to October of 2010, were the parents offered gas cards?

A. Yes, they have been.

Q. And what are gas cards?

A. They're just different amounts of money put on cards that will enable them to buy gas where they could come.

Q. Were payments offered and vouchers to pay for hotel rooms and motel rooms?

A. Yes. Hotel rooms were mentioned. And I believe she said - - I mean, we offered her a gas card, and she said she didn't have anywhere to stay. And, you know, we did tell her that we could put her up in a motel room.

Q. Did you ask her to move away from Lawrence County where the children were in custody?

A. No, we did not.

***

Q. Okay. Was she offered a bus ticket from Missouri to visit with the children?

A. Yes.

Q. And wasn't she offered that bus ticket but was not offered transportation from the bus station in Nashville to Lawrenceburg?

A. I'm not aware of that.

Q. Are you aware of transportation being arranged for her to arrive at the bus station and then be transported to Lawrenceburg so she could exercise visitation?

A. It would have been.

Q. Did you tell Ms. Beason that so she would know those were the things available to her if she were to take advantage of it?

A. Well, she said the reason she didn't want to come on a bus is she didn't want to travel by herself. She didn't mention anything else.

Q. Did she specify to you why she didn't want to travel by herself?

A. No.

***

Q. Do you remember how many bus tickets you offered her?

A. I can't remember.

Q. Do you remember how many times you offered her a hotel room?

A. I don't remember the number.

A permanency hearing order entered in the dependent and neglect proceeding on November 4, 2009,[9] recites that "[t]he parents have not visited the children since January 2009. . . [Mother] has not visited her children since January 2009 and has moved out of state. . . [Father] has not visited the children since at least January 2009 and has not provided DCS with an accurate address." The March 2, 2010 permanency plan for Donald B. states:

> These children were in custody of the State of Iowa, Department of Human Services from March 2007 to September 4, 2008. The children were taken into Iowa legal custody in March 2007, due to indicated allegations that [Father] had hit the children in their head, back and arms, and due to the environmental conditions of the home at which the children were found. For about a month in the Spring of 2007, the children and their parents absconded from the Iowa Juvenile Court. Eventually, they were found in Texas. Iowa then took not only legal but physical custody of the children.
>
> The Iowa DHS provided a caseworker and numerous services. [Father], however, was not present. He never appeared during this almost year and half period of Iowa custody. (If he had appeared he would have been arrested on the then, as now, pending 4 counts of child neglect charges.)

---

[9] Mother participated in the development of the permanency plan which was the subject of the hearing. The order reflects that Mother disagreed with adoption of the children as a goal and that Mother "says she will not come to TN due to financial issues."

The record of the dependent and neglect proceeding includes the following information from the case recording of October 19, 2009 relative to the Department's efforts to involve Father in the development of the permanency plan:

> A phone call was placed to [Father], but he did not answer. The voicemail in [Father's] phone stated that the phone belonged to [Mother]. [Mother] stated that she has not seen or spoken with [Father].

The case recording completed March 17, 2010 includes the following entries:

> This FSW asked [Father] if he could travel to Tennessee to visit the children if DCS offered him a gas card. [Father] said he could not come back to Lawrenceburg because the police 'hunted' him 'down like a dog every day' and 'threatened' him 'every time he turned around.'
> This FSW told [Father] that Kellie and Cera would be moving into pre-adoptive placement.
> This FSW informed [Father] of the CFTM[10] scheduled for March 2 and asked if he could participate in the meeting by phone. [Father] said he would participate if he has minutes on his phone."

Significantly, the case recording completed April 30, 2010 noted:

> This FSW spoke with [Father]. . . . [Father] was concerned that his children have not contacted him by phone. This FSW explained to [Father] that the children have his phone number and that their resource parents know to allow the children to call when they want to.
>
> Regarding the conditions that brought the children into DCS custody, [Father] said he could not get all of the children enrolled in school. [Father] said he was falsely accused of educational neglect. [Father] went on to say that their house was virtually empty because the family had to return to Iowa to get the rest of their belongings. [Father] said that if he had been given more time he could have gotten the furniture for the house they were living in Lawrenceburg.
>
> This FSW went over the Criteria and Procedures for Termination of Parental Rights with [Father]. This FSW explained to [Father] that if he fails to visit

---

[10] This refers to the Child and Family Team Meeting held when a child is in the Department's custody.

his children for four months, that that would meet the criteria for TPR. [Father] indicated understanding.

[Father] said he wants [Mother], the children's mother, to have custody of the children. [Father] said he would stay away from [Mother] and the children and call them once or twice a month.

The foregoing evidence shows clearly and convincingly that neither Mother nor Father had a justifiable excuse for failing to visit the children within the four months preceding the filing of the petition; resources were made available to them to visit and they failed to do so. The court correctly held that the parents' failure to visit the children was wilful.

Mother and Father argue to differing degrees that the Department "thwarted" their efforts to maintain a relationship with the children. We construe this argument to be related to the responsibility of the Department to "make reasonable efforts to reunify children and their parents after removing the children from their parents' home." *In re Tiffany B.*, 228 S.W.3d 148, 158 (Tenn. Ct. App. 2007) (citing Tenn. Code Ann. § 37-1-166). In addressing this argument, in addition to the case recordings mentioned previously, we find it helpful to refer to the October 21, 2009 permanency plan in the record even though termination of parental rights was not sought on the grounds that Mother and Father failed to comply with the permanency plans.[11]

The October 21, 2009 permanency plan modified the original plan which had been adopted October 30, 2008, when the Department was first given custody of the children; the 2009 plan was ratified by the Juvenile Court on November 9, 2009. The original plan established the goal of returning the children to their parents and set forth actions to be taken by both parents in order to achieve that goal. The 2009 plan added adoption as a goal "because the parents have made little to no progress in completing the Permanency Plan" and established actions to be taken by the Department leading to adoption. The 2009 plan provided that both parents could have supervised visits with the children, as well as communication by phone or letter; the actions to be taken by the parents which would lead to the return of the children were slightly modified from the original plan. Of particular

---

[11] The permanency plans in the record are, in large part, incomplete and not fully identified and explained in the testimony; the October 21, 2009 plan for Donald B., however, introduced as exhibit 12 at the hearing, is complete and was properly identified. The 2009 plan recites that Mother was residing in Missouri and Father in Iowa, that the Department had addresses and phone numbers for both parents, and that Mother participated in the plan's development by phone but Father did not attend. While the plans developed October 21, 2009 for the other two children are not in the record, we have no reason to doubt that the provisions of those plans were any different.

relevance to the contention of the parents, the plan calls for Mother to continue with mental health counseling and medication management, to participate in an interstate compact study, to visit the children at least once per month, and to address her history of violent relationships with a counselor; the plan also provides that Father will pay child support. A Permanency Hearing Order entered in the Juvenile Court on November 4, 2009 notes that the Department "is making reasonable efforts toward finalizing the permanency goals by providing or referring: . . . intensive in-home case management . . . homemaker services . . .". The order states that "[t]he parents have not participated in parenting assessments. The father has not participated in a psychological assessment" and that "[Mother] does not agree with adoption as a goal. She says she will not come to TN due to financial issues."

Inasmuch as neither Mother nor Father participated in the termination hearing, their arguments are largely centered around assertions that the evidence does not show that the Department did what it could to foster their relationships with the children. The evidence noted above, however, shows that from the beginning, reunification with the parents was a goal of the Department, that definite steps to lead to reunification were identified and resources put in place, but that Mother and Father failed to take the steps that would lead to reunification. The evidence clearly and convincingly shows that the Department did its best to perform its duty to the children as well as make reasonable efforts to reunify them with their parents. As noted in *In re Georgianna H.*, 205 S.W.3d 508 (Tenn. Ct. App. 2006), however, "parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required [DCS] to remove their children from their custody." *Id.* at 519. While the record shows that the parents maintained varying measures of contact with the Department and the children, the record is devoid of evidence that the parents took appropriate measures to reunify with the children or took advantage of the resources provided by the Department to facilitate reunification. The efforts expended by the Department were reasonable and there is no evidence that the representatives of the Department in any way thwarted either parent's opportunity to visit the children.

B. Best Interest

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. The legislature has set out a list of factors at Tenn. Code Ann. § 36-1-113(i) for the courts to follow in determining the child's best interest. The list of factors in the statute is not exhaustive, and the statute does not require every factor to appear before a court find that termination is in a child's best interest. *See In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *State of Tennessee Dep't of Children's Servs. v. T.S.W.*, No. M2001-

-11-

01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

In determining that termination was in the best interest of the children, the court stated:

The Court finds by clear and convincing evidence that termination is in the best interest of the children. Pursuant to Tenn. Code Ann. §36-1-113(i). The Court has considered the following statutory provisions:

Whether either parent has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in the home of the parent;
Whether either parent has maintained regular visitation or other contact with the children;
Whether a meaningful relationship has otherwise been established between either parent and the children;
The effect a change of caretakers and physical environment is likely to have on the children's emotional, psychological and medical condition; and
Whether the physical environment of either parent's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render either parent consistently unable to care for the children in a safe and stable manner.

The girls have been in the home of [Foster Parent] since February of 2010, or more than seventeen (17) months. [Foster Parent] testified that she knew the girls through church for a year prior to their coming into her home. The girls want very much to be adopted by [Foster Parent]. [Donald B.] is currently in a facility in Texas, addressing his severe mental health problems. The Court finds that a change of caretakers and physical environment of either of these children at this time would be devastating.
The Court is satisfied that neither parent has made an adjustment of circumstances, conduct or conditions as to make it safe and in the children's best interest to be placed with them; that neither parent has maintained regular visitation or other contact with the children and that no meaningful relationship has otherwise been established between either parent and the children. Neither parent has shown any interest in showing to the Court that he or she is consistently able to care for the children in a safe and stable manner.

The record in this case shows that these parents chose not to be involved in the lives of these children from the time the children were taken into custody due to a finding that the children were dependent and neglected. For whatever reason, Mother and Father declined to come to Tennessee to visit or be with their children and failed to appear at the hearing where the best interest of the children would be determined. The record clearly and convincingly supports the finding of the court that termination of parental rights was in the best interest of the children.

## IV. Conclusion

For the foregoing reasons, we reverse the holding terminating parental rights on the ground of abandonment by failure to support; in all other respects the judgment of the Chancery Court terminating the parental rights is AFFIRMED.

_____
RICHARD H. DINKINS, JUDGE